UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x

ANDREA J. NUSSINOW,

              Plaintiff,

      - against -                           1:19-**cv**-332 (FJS/CFH)

COUNTY OF COLUMBIA, RONALD PEREZ, as
President of the Columbia-Greene Humane Society, Inc.     COMPLAINT
and in his individual capacity, LEE DELISLE, as
Chief Investigator for the Columbia-Greene Humane     Jury Trial Demanded
Society, Inc. and in his individual capacity, and
COLUMBIA-GREENE HUMANE SOCIETY, INC., doing
business as the Columbia-Greene Humane Society/SPCA,

              Defendants.

-------------------------------------------------------------------------------x

      Plaintiff Andrea J. Nussinow, by her attorneys Mansfield, Gautier & Rosenthal

LLP, for her Complaint against Defendants County of Columbia (the "County"), Ronald

Perez ("Perez"), Lee DeLisle ("DeLisle"), and Columbia-Greene Humane Society, Inc.

doing business as the Columbia-Greene Humane Society/SPCA (the "SPCA"), alleges as

follows:

Introduction

      1.    This action arises under the laws of the United States and the State of New

York.  The County, through its District Attorney, maliciously prosecuted Plaintiff on ten

criminal charges pursuant to Section 353 of the New York Agriculture & Markets Law,

alleging that Plaintiff failed to provide water and proper sustenance for several horses and

other animals that resided on Plainitff's farm.  This conduct violated Plaintiff's due

process rights under the Fourth and Fourteenth Amendments to the United States

Constitution, in that the County – having employed a policy and/or custom of effectively delegating its responsibility to investigate and prosecute animal cruelty charges to the SPCA – permitted and endorsed the conduct of DeLisle, Perez and the SPCA that deprived Plaintiff of her liberty rights to be free of unreasonable searches and seizures. As a consequence, the County violated Plaintiff's rights under 42 U.S.C. § 1983. Moreover, the charges lacked probable cause, as shown by the fact that a grand jury before which the County presented its case against Plaintiff instead refused to issue a true bill of indictment against her, thereby terminating the criminal proceeding in Plaintiff's favor. The commencement and relentless continuation of the criminal proceeding by the County were a product of actual malice on the part of the County, its employees and agents against Plaintiff.  In addition to violating Plaintiff's rights under the Constitution, the County's conduct also constituted common-law malicious prosecution under the laws of the State of New York.

2.      Perez, DeLisle and the SPCA, acting under color of law as Peace Officers for the County and as assistants in the prosecution of Plaintiff by the County, deprived Plaintiff of her civil rights under the Fourth and Fourteenth Amendments to the United States Constitution.  DeLisle engaged in an unlawful search of Plaintiff's property, and Perez, DeLisle and the SPCA participated in the unlawful search and seizure of Plaintiff upon her arrest and her subsequent prosecution, and continued to violate Plaintiff's rights during the course of the criminal prosecution and thereafter through their repeated acts of intimidation and aggression toward her, as well as their continued trespasses on her property. DeLisle also violated Plaintiff's due process rights under the Fourth and Fourteenth Amendments prior to Plaintiff's arrest, when DeLisle threatened her with

immediate arrest in a successful effort to compel Plaintiff to "consent" to allow him and an officer of the New York State Police to search her farm, thus depriving Plaintiff of her liberty interests. DeLisle also engaged in malicious prosecution of Plaintiff in violation of her Constitutional due process rights.

3.      Perez and DeLisle also engaged in the negligent infliction of emotional harm upon Plaintiff.  As state actors investigating potential violations of New York State law, Perez and DeLisle had a duty to Plaintiff to act in accordance with law, treating Plaintiff in a fair and even-handed manner when discharging their duties.  Instead, Perez and DeLisle threatened, bullied and harassed Plaintiff on multiple occasions in connection with the criminal investigation and prosecution, as well as a subsequent unlawful entry upon Plaintiff's property, with the intent to intimidate her, thereby directly causing her substantial emotional harm.  The SPCA, as the employer of Perez and DeLisle, is vicariously liable for their conduct and the harm caused to Plaintiff as a result.

4.      As a result of the foregoing conduct by Defendants, Plaintiff suffered significant monetary losses and severe emotional injury, as well as devastating harm to her reputation.  The nature of Defendants' conduct was so extreme as to shock the conscience of a reasonable person, thereby calling for the imposition against the SPCA, Perez and DeLisle of punitive damages.

Parties

5.      Plaintiff is an individual who resides at 84 Nevis Road, Tivoli, New York. Plaintiff has been engaged in business related to the care, evaluation, training and trading of horses for over forty years, including as a certified equine appraiser, a trainer and breeder of race, jumping and dressage horses, and a riding instructor.

6.     The County is a municipal subdivision of the State of New York.  Among the functions of the County, through its District Attorney, is the investigation and prosecution of alleged criminal violations of, among others, the laws of the State of New York.  The County has ultimate authority over the Columbia County District Attorney, and the prosecutors and staff who work for the District Attorney's Office.

7.     Perez is the President of the SPCA.  Perez is also a New York State Peace Officer and a "cruelty investigator" for the SPCA.  Upon information and belief, Perez is not a veterinarian and is not qualified to provide veterinary care to large animals or equines.  Upon information and belief, Perez is and at all relevant times was an employee of the SPCA.  Perez's principal place of business is 111 Humane Society Road, Hudson, New York.  Upon information and belief, Perez resides in the State of New York.

8.     DeLisle is the Chief Investigator for the SPCA.  DeLisle is also a New York State Peace Officer and a "cruelty investigator" for the SPCA.  Upon information and belief, DeLisle is not a veterinarian and is not qualified to provide veterinary care to large animals or equines.  Upon information and belief, DeLisle is and at all relevant times was an employee of the SPCA.  DeLisle's principal place of business is 111 Humane Society Road, Hudson, New York.  Upon information and belief, DeLisle resides in the State of New York.

9.     The SPCA is a not-for-profit corporation organized under the laws of the State of New York.  Upon information and belief, the SPCA does business as the Columbia-Greene Humane Society/SPCA.  Upon information and belief, the SPCA employed Perez and DeLisle in their current capacities since prior to June 1, 2017.  The SPCA's principal place of business is 111 Humane Society Road, Hudson, New York.

<u>Jurisdiction and Venue</u>

10.     This Court has federal question subject-matter jurisdiction over this litigation pursuant to 28 U.S.C. § 1331, as a substantial part of the action arises under the Constitution and the laws of the United States of America.  This Court has supplemental jurisdiction over the claims arising under the laws of the State of New York.

11.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b)(1), in that the SPCA and the County reside within this judicial district and, upon information and belief, all Defendants are residents of the State of New York.  Venue also is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

<u>Facts Common to All Claims</u>

<u>Plaintiff's Farm</u>

12.     At all times relevant hereto, Plaintiff has owned and operated a horse farm which offers boarding and breeding facilities and services, particularly with respect to thoroughbred horses.  Plaintiff lives in a house on the property.

13.     At all relevant times, Plaintiff has kept horses and other animals on her farm.  The other animals included ponies, donkeys, cattle and sheep.  Some of the animals are owned by Plaintiff, while others were owned by persons who boarded horses at the farm.

14.     The farm consists of approximately forty acres.  There are two large barns on the farm, one of which contains stalls and is used primarily to board horses being bred by Plaintiff, as well as the offspring produced from those breedings.  The other barn contains a large arena for exercising horses, as well as other stalls inhabited by horses

belonging to Plaintiff and other persons.  In addition to these barns, there are several

fenced-in paddocks where some horses and other animals live.  Those paddocks contain

shelters for the animals to protect them from the elements.

15.     Each of the barns is, and at all relevant times was, equipped with water

spigots and receptacles to provide fresh drinking water to the horses.  At all relevant

times, the paddocks each had several large buckets and troughs in which water was kept

for the horses and other animals to drink.  Water buckets and troughs were filled several

times a day, in the morning, at midday, late afternoon and evening, with more refills

during the warm weather months.  Plaintiff and her workers rotated through the barns and

paddocks regularly, filling water buckets and troughs that had been drained by the horses

and other animals.

16.     In addition to water, at all relevant times there was plentiful feed available

for the horses and other animals.  Hay bales were placed in the paddocks and barns, and

replaced when depleted.  Horses were also provided with high quality feed on a regular

basis throughout the day.

Plaintiff's Prior Contact With Perez, DeLisle and the SPCA

17.     In or about 2014, the SPCA initiated an investigation into Plaintiff's

operation of her farm.  This investigation was prompted by a disgruntled former tenant in

one of the barns, who made a false complaint or complaints after being directed to vacate

Plaintiff's premises.  Both DeLisle and Perez met with Plaintiff at the farm several times

during the approximately six months of the investigation.  Plaintiff cooperated fully with

this investigation.  No charges of wrongdoing were brought against Plaintiff as a result of

the complaints and investigation.  DeLisle eventually told Plaintiff that he did not believe the complainant.

18.     To the best of Plaintiff's knowledge, no other investigations were conducted with respect to her or her farm either before the foregoing investigation or between its conclusion and early July 2017.

The Relationship Between the County and the SPCA, Perez and DeLisle

19.     Upon information and belief, the County has a contractual or other legal relationship with the SPCA which entails, among other things, the use of the SPCA's personnel to investigate claims relating to the mistreatment of animals located within the geographic boundaries of the County.

20.     Upon information and belief, under the foregoing arrangement the District Attorney, as the chief policy-maker for the County, has adopted a policy and/or custom of delegating to the SPCA's "cruelty investigators" the investigation of complaints that animals are being mistreated in violation of, among other things, the New York Agriculture & Markets Law.  Upon information and belief, the District Attorney, as the chief policy-maker for the County, has adopted as a policy and/or custom not to supervise the investigative actions of the SPCA's "cruelty investigators" in connection with complaints regarding the alleged mistreatment of animals.

21.     Upon information and belief, the SPCA refers matters that it contends violate such laws to the County's District Attorney for criminal prosecution.

22.     Upon information and belief, the District Attorney, as the chief policy-maker for the County, has adopted as a policy and/or custom that when the District Attorney, on behalf of the County, receives a referral for criminal prosecution from the

SPCA, the District Attorney does no independent investigation to determine whether the factual allegations made by the SPCA or its personnel are true or accurate.  Upon information and belief, the District Attorney, as the chief policy-maker for the County, has adopted a policy and/or custom to rely upon allegations made by the SPCA and its personnel when seeking search and arrest warrants in connection with the SPCA's referrals.

23.     Upon information and belief, the District Attorney, as the chief policy-maker of the County, adopted and maintained the foregoing policy and/or custom even though the District Attorney knew or deliberately disregarded the likelihood that the policy and/or custom would directly cause persons prosecuted as a result of the referrals by the SPCA or its personnel to be subjected to the unreasonable loss of their Constitutional rights to liberty and property.

Plaintiff Begins to Rescue Horses

24.     In the spring of 2017, Plaintiff began to participate in efforts to rescue horses that had been caught up in a process whereby they were sold at auction repeatedly, often eventually ending up at slaughter facilities.  Many of these horses were old and sick, and most of them were in poor physical condition.  Plaintiff felt sympathy for these horses and wished to provide them with a safe place to live.

25.     During the period from in or about April 2017 through in or about June 2017, Plaintiff acquired approximately ten horses through the rescue channels she had become involved with.  These horses were shipped to the farm in several deliveries. Without exception, the horses that Plaintiff rescued during this time were in very poor physical shape, being underweight for their size, having poor muscle and skin tone, and

overall showing evidence of severe neglect that is characteristic of horses caught up in the slaughter auction process.  Several of these horses were so shy of human contact that they could not be handled at all.  While none of these rescue horses was obviously sick, Plaintiff knew that they could have been exposed to contagious illnesses before they came to the farm.

26.     To avoid the potential spread of disease from these rescue horses to other animals on the farm, Plaintiff kept all of the rescue horses confined in a paddock together, at the front of the property, which was isolated from contact with other animals on the farm.  After handling or caring for the rescue horses, Plaintiff maintained a strict protocol whereby, before entering the barns or handling other animals, she and her workers would disinfect their hands and shoes.  People who had contact with the rescue horses were not permitted to handle or be in close contact with other animals on the farm.

27.     The rescue horses were provided with plentiful fresh water and hay. Plaintiff also fed the rescue horses a high-protein feed, to try to build up their body mass. Because of the condition of these horses, Plaintiff had to take care not to overfeed them, which could be dangerous for them.  Nevertheless, most of the rescue horses showed some improvement in their physical condition during the weeks or months they were living on the farm prior to the beginning of July 2017.

DeLisle Appears at the Farm

28.     On Saturday, July 1, 2017, Plaintiff began her daily chores in the morning about 7:00 a.m.  Because the Independence Day holiday was upcoming, Plaintiff had given her staff a few days of vacation.  As a result, Plaintiff was working alone at the farm at that time.

29.     At approximately 10:15 a.m. on July 1, 2017, two cars drove onto the farm, one a New York State police vehicle and the other a vehicle belonging to DeLisle. Plaintiff went to meet them.  The New York State trooper and DeLisle told Plaintiff that they had received a complaint about some "skinny" horses and that they wanted to search her premises.  Plaintiff explained that she had rescued several horses from slaughter auctions and that those were probably the horses that they were concerned with.  Plaintiff offered several times to show DeLisle and the New York State trooper documents that Plaintiff had received when she acquired the rescue horses, which would confirm when and how she had obtained them, and their condition.  DeLisle refused to listen to Plaintiff or allow Plaintiff to get her papers or show him any documents concerning the rescue horses.  DeLisle began to question Plaintiff in an angry and aggressive tone, asking her where her staff was, and which veterinary group she used for the animals on the farm. Neither DeLisle nor the New York State trooper told Plaintiff that she could refuse to answer his questions, that if she did answer her responses might be used as evidence against her in a criminal proceeding, or that she had a right to speak with an attorney before answering any questions.  Plaintiff identified the veterinary group she used, and told DeLisle and the New York State trooper that her staff was away for the holiday and would not be back until the following week.  DeLisle then thrust a piece of paper under Plaintiff's nose and insisted that she sign it.  When Plaintiff asked to read the paper, DeLisle, a male over six feet in height and with a heavyset build, became angry and began to shout at Plaintiff, demanding that she sign the paper and threatening to arrest Plaintiff if she did not sign.  Plaintiff, a slender female approximately five feet two inches tall and weighing 100 pounds, was shocked and frightened by DeLisle's manner and his

threats, which fear was reinforced by the presence of the armed New York State trooper standing beside DeLisle.  In order to placate DeLisle and hoping to defuse the situation, Plaintiff signed the paper without having been permitted to read it first.  DeLisle snatched the paper from Plaintiff, shouting that she had signed the paper "voluntarily" and waving it in her face.  At that point, the New York State trooper warned Plaintiff of her right to remain silent, even though DeLisle had already questioned Plaintiff extensively without giving those warnings.  DeLisle then allowed Plaintiff to look more closely at the paper and Plaintiff saw that it was captioned "Voluntary Consent to Search Certain Premises," which had been filled out beforehand except for Plaintiff's signature.  Notwithstanding the caption on the document, Plaintiff did not sign the document voluntarily, because she was afraid that if she did not sign DeLisle would actually arrest her.

30.     DeLisle and the New York State trooper then began to walk toward the paddock where the rescue horses were being kept.  Plaintiff ran to get her paperwork, to show DeLisle and the New York State trooper that what she had said about the rescue horses was correct.  When Plaintiff returned to DeLisle, she tried to show him the files but he refused to look at them.

31.     At DeLisle's insistence, Plaintiff showed him and the New York State trooper the paddock where the rescue horses were being kept.  Neither DeLisle nor the New York State trooper examined any of the horses.  DeLisle then demanded to see all of the barns and the other paddocks on the farm.  Plaintiff conducted them wherever they wanted to go and showed them all the animals they asked to see.  At one point, DeLisle asked Plaintiff about an elderly pony, stating that it looked thin to him.  Plaintiff told DeLisle and the New York State trooper that the pony was very old, that she could not

11

keep weight on him, but that he was provided with plenty of food and water, as well as a run-in barn for shelter in inclement weather.  DeLisle did not ask to examine this animal or take any other steps to confirm what Plaintiff had told him about it.

32.     The tour took at least an hour.  At the end, Plaintiff walked with DeLisle and the New York State trooper back to where their cars were parked, with DeLisle and the New York State trooper walking ahead of her.  Plaintiff offered to allow the SPCA to take all of the rescue horses if DeLisle wished.  Neither DeLisle nor the New York State trooper responded to this offer.  Plaintiff then overheard DeLisle say to the New York State trooper that he could "get her", meaning Plaintiff, on numerous charges.  DeLisle got into his car and left.  Plaintiff was frightened and upset by what DeLisle had just said to the New York State trooper.  After he had gone, Plaintiff reiterated to the New York State trooper that if the SPCA was concerned about the rescue horses, Plaintiff would allow DeLisle  and the SPCA to take physical custody of those horses.  The New York State trooper refused, stating that Plaintiff had to keep the rescue horses at the farm.  The New York State trooper added that Plaintiff should keep doing what she had been doing, suggesting that if Plaintiff did so there would be no further problem.  The New York State trooper then got into her vehicle and drove off the farm.

33.     Plaintiff was shocked and frightened by this experience.  However, since it was not clear to her what was going to happen, if anything, Plaintiff continued caring for the animals and the farm as normal.

34.     There were no further contacts from DeLisle or any Defendant between July 1, and July 3, 2017.  Nobody associated with the SPCA or the County contacted Plaintiff, asked to interview her, or requested that she provide them with any information

confirming her statements concerning the condition of the rescue horses.  Nobody

associated with the SPCA or the County attempted to remove any animals from

Plaintiff's custody during this period or thereafter.

The County Obtains a Search Warrant Based on Misleading Information from DeLisle

35.     On July 1, 2017, DeLisle made a statement under oath in his capacity as

the "Chief Investigator with the Columbia-Greene Humane Society/SPCA …."  DeLisle

stated that on the same date he and the New York State trooper had entered Plaintiff's

farm, Plaintiff "signed a written consent to check the remainder of the property …."

However, DeLisle did not reveal that he had procured Plaintiff's signature on the consent

form by threatening to immediately arrest her if she did not comply with his shouted

demands that she sign.  DeLisle further stated that he "noticed at least three horses to be

in very thin, and poor condition."  However, DeLisle did not disclose that Plaintiff had

explained that the rescue horses that he identified in his statement had come into

Plaintiff's possession in poor physical condition, nor did DeLisle disclose that Plaintiff

had offered several times to show him and the New York State trooper who had

accompanied him the documents substantiating her claims, but that DeLisle had refused

to allow her to do so.  DeLisle also stated that he observed "an older pony that was in

extremely emaciated condition."  However, DeLisle did not reveal that Plaintiff had

explained to him that the pony was very old and that, notwithstanding his appearance, the

animal was being given adequate food, water and shelter.

36.     Upon information and belief, on or about July 3, 2017, a prosecutor

employed by the County's District Attorney's office applied to a Town Justice for the

Town of Clermont in the County of Columbia, for a search warrant for Plaintiff's farm.

Upon information and belief, the prosecutor relied in whole or significant part upon DeLisle's sworn statement in applying for the search warrant.  Upon information and belief, the prosecutor did not inform the judge of the relevant information that DeLisle had omitted from his statement.  Upon information and belief, the prosecutor requested a warrant giving "any Peace Officers and Agents of the Columbia-Greene Humane Society" authority to enter Plaintiff's farm on a continuing basis to examine any animals determined to have been subject to cruelty or neglect "to determine if they are in fact receiving necessary food, water, shelter and necessary veterinary care …," notwithstanding that the issuance of such a warrant would be overbroad and improper.

37. Upon information and belief, the judge relied upon DeLisle's statement in issuing a warrant to search Plaintiff's farm on July 3, 2017.  Upon information and belief, had DeLisle's statement not misleadingly omitted the information summarized above, the judge would not have issued the search warrant.

38. Upon information and belief, no person employed by the County, including the District Attorney and prosecutors in the District Attorney's office, made any effort to confirm independently the truthfulness, accuracy or completeness of the allegations in DeLisle's statement.

39. The search warrant issued requires, among other things, that it be executed "[a]fter first giving notice of [the executing officer's] authority and purpose."

<u>DeLisle and Perez Appear at the Farm to Arrest Plaintiff</u>

40. Tuesday, July 4, 2017 was the national holiday of Independence Day. Plaintiff woke as usual early in the morning and, by about 7:00 a.m., she was working on the farm, filling water troughs and feed buckets, and doing other regular chores.  All of

14

the water buckets and troughs that were customarily present in the barns and paddocks, and had also been present on July 1, 2017, were present on July 4, 2017.  Plaintiff received a hay delivery at about 7:30 a.m., assisting the delivery men in getting the hay into the barns.  Plaintiff then discovered that a steer had broken through the fence of the back paddock.  Plaintiff interrupted her round of refilling water buckets and troughs to retrieve the cattle that had escaped.  All of the horses in both barns and the front paddock were given feed and hay.  At about 9:30 a.m., a potential new employee came to the farm to interview with Plaintiff.  This person left about 9:50 a.m.

41.     As Plaintiff was starting to refill water buckets in one of the barns after the potential employee had left, several cars drove onto the farm.  A New York State trooper emerged from one vehicle outside of the barn where Plaintiff was working, announcing, "they're here!"  When Plaintiff emerged from the barn to see what was happening, the New York State trooper handed Plaintiff a copy of the search warrant.  Plaintiff saw that in addition to the New York State trooper, DeLisle and Perez were also present on the property, as well as other members of the staff of the SPCA who were not introduced to Plaintiff, and a woman who Plaintiff was told was a veterinarian working with the SPCA. Plaintiff was not familiar with this veterinarian, as she was not one of the large-animal specialists who worked with Plaintiff's horses and other animals.  Plaintiff subsequently learned that this veterinarian was not a specialist in large-animal care or treatment.

42.     Plaintiff rushed to the area where DeLisle, Perez and most of the other visitors were gathered, near the front of the farm.  Plaintiff was very frightened.  She did not want these visitors to scare or injure the horses, who they were at that moment chasing around the front paddock, trying to catch.  Plaintiff persuaded DeLisle, Perez and

the others that she should handle the horses if these persons wanted to examine them. Plaintiff then went into the paddock, calmed the horses, and began to show them to DeLisle, Perez and the veterinarian one by one, as DeLisle and Perez directed.  With respect to several of the horses, the veterinarian took a quick look at them, walking around one horse but not handling any of them.  Perez or DeLisle then took a photograph of the horses that the veterinarian indicated to them.  At some point, Plaintiff was able to gather her files for the rescue horses, and she again offered to show DeLisle, as well as Perez and the veterinarian, the information, but they refused to look at them.

43.     When they had finished looking at all the rescue horses, DeLisle and Perez demanded in angry tones that Plaintiff take them to see each of the barns and paddocks, just as DeLisle had on July 1st.  Plaintiff cooperated fully, showing them whatever they wanted to see, intervening only to maintain her isolation and sterilization protocols, to protect the animals in Plaintiff's care.

44.     Plaintiff showed Perez, DeLisle, the other people from the SPCA and the New York State trooper all of the animals on the farm, including the horses that belonged to Plaintiff's clients.  From time to time, the veterinarian would call out a number and either Perez or DeLisle would take a photograph of that particular animal.  They ignored all efforts Plaintiff made to explain the particulars concerning any of the animals they were looking at.

45.     The search took almost two hours.  At no time during this period did Plaintiff feel as though she was free to leave.  At one point Plaintiff was bringing a horse that the veterinarian had asked to see out of the barn and the horse, alarmed by the noise

16

and the strangers, reared up near DeLisle.  DeLisle shouted at Plaintiff that if she did that

again, he would arrest her.

46.     When they had seen everything they had asked to see, DeLisle, Perez and

the New York State trooper gathered away from Plaintiff.  Shortly thereafter, the New

York State trooper approached Plaintiff and announced that she was arresting Plaintiff.

The New York State trooper handcuffed Plaintiff and led her to a police vehicle.  Plaintiff

protested that there was no help on the farm and that, on a hot July day, the farm could

not be left all alone as it was a danger to the animals to be left unattended without

replenishment of their water supply.  The New York State trooper replied that Plaintiff

would be processed and back on the farm in an hour.  As she was being led to the vehicle,

Plaintiff observed that while everyone other than the New York State trooper had left,

DeLisle waited until he saw Plaintiff handcuffed before he too drove off.

47.     Plaintiff was taken to the New York State Police barracks.  Contrary to

what she had been told, Plaintiff was not released for several hours.  When she returned

to the farm, Plaintiff found that none of the horses had been provided with water by any

of the SPCA personnel while Plaintiff had been gone.

Perez Returns to the Farm

48.     On July 7, 2018, at approximately 1:00 p.m., after Plaintiff had completed

her morning chores and had gone into her house for lunch, Perez entered the farm without

announcing himself to Plaintiff.  Contrary to the requirements of the search warrant,

Perez did not give Plaintiff notice of his authority or purpose in entering her property

before beginning to search.  Perez thereafter went to one of the barns without notice or

permission from Plaintiff, and turned on a water hose, failing to turn the water off before

he left the barn.  Plaintiff later discovered that Perez, by failing to turn the water off, had caused the floor of that barn to become flooded.  At some point after leaving the barn, Perez went to Plaintiff's front door and began to pound on it, shouting for Plaintiff to open the door.  Plaintiff was terrified at the unexpected intrusion.  She rushed to the door and opened it to find Perez on the doorstep.  Perez demanded angrily that Plaintiff "get [her] ass up to the barn" to water the horses, claiming that he had filled an empty water bucket.  Perez threatened that if Plaintiff did not comply to his satisfaction, Plaintiff was "going into lock-up!"

49.     Plaintiff asked Perez if he had a warrant to be on the property.  Perez said that he did, but did not produce it.  Instead, Perez told Plaintiff to talk to her attorney.  Plaintiff was confused by this statement, since she had not yet retained counsel, though she had spoken with several attorneys seeking representation in connection with the criminal matter.  Shortly afterwards, Perez got into his vehicle and left.

50.     Perez's visit to the Plaintiff's farm caused Plaintiff to feel frightened and endangered.  That day, after Perez left the property, Plaintiff installed a gate with a lock on the front entrance to the property, to avoid having him or other persons enter unannounced and without permission.

Perez and DeLisle Return to the Farm

51.     The next day, July 8, 2017, Plaintiff was working in one of the barns, when Perez and DeLisle again the farm without prior notice to Plaintiff, this time accompanied by the New York State trooper who had been present on July 4th.  Upon information and belief, these persons pushed the gate open far enough to squeeze through

the opening, rather than simply contact Plaintiff in advance to obtain admittance to the property.

52.     Perez, DeLisle and the New York State trooper insisted on looking around the farm.  The went through each of the barns and paddocks that had been searched on July 1st and July 4th.  They encountered an employee of Plaintiff in one of the barns and questioned her aggressively.  Upon information and belief, as a result of this questioning and the stress of relating to the appearance of law enforcement officers coming unannounced onto the property, this employee left Plaintiff's employment shortly thereafter.

53.     While he was walking through one of the barns, DeLisle said to Plaintiff that he had a message for her from someone she knew.  DeLisle then named a person who Plaintiff knew as a business competitor of hers.  This person had also been involved with Plaintiff's former tenant, who had made the unfounded complaints against Plaintiff in 2014 to the SPCA.  Plaintiff asked DeLisle what the message was, but DeLisle only replied that this person had a "big smile" when she heard that Plaintiff had been arrested. Plaintiff was shocked and frightened by DeLisle's statement, which plainly suggested that DeLisle had been working with a competitor of Plaintiff's to damage Plaintiff's business by causing Plaintiff to be arrested.

54.     After they had completed their search and were returning to the front of the property, Plaintiff asked DeLisle, Perez and the New York State trooper whether they had a search warrant.  The New York State trooper replied that it had been sent to Plaintiff's lawyer, naming a person whom Plaintiff had briefly consulted upon her arrest but had not subsequently engaged to represent her.  Plaintiff told the New York State

trooper, DeLisle and Perez that Plaintiff had engaged different counsel.  At this point, a relative of Plaintiff's entered the property, whereupon Perez, DeLisle and the New York State trooper left, squeezing back through the gate where it was partially ajar.

55.     This appearance by Perez, DeLisle and the New York State trooper caused Plaintiff to feel threatened, vulnerable and endangered.  Not only had the gate and lock not forestalled the unannounced entry of Perez, DeLisle and the New York State trooper without a warrant, but DeLisle had made clear that he was working with her competitors to do Plaintiff harm.

Further Visits to the Farm by Perez and DeLisle

56.     During the months of August and September 2017, DeLisle and/or Perez made two additional, unannounced visits to the farm.  Upon information and belief, on at least one occasion they entered Plaintiff's property by either pushing the gate open from the outside, or by scaling the fencing that ran along the road outside the property, climbing over or slipping under the fence.

57.     On the first such visit, on or about August 2, 2017, Perez entered the property in his vehicle, drove up to the barn area, then drove back toward Plaintiff's house, where Plaintiff encountered him.  Plaintiff approached Perez's vehicle and asked whether he had a search warrant.  Perez replied that he did, but he did not produce one.  Perez attempted to question Plaintiff, but when Plaintiff asked that Perez produce a warrant, Perez instead drove off of Plaintiff's property.

58.     On the next visit, on or about September 22, 2017, Perez and DeLisle appeared with a New York State trooper.  Upon information and belief, Perez, DeLisle and the New York State trooper parked their vehicles outside Plaintiff's property and

then climbed over or pushed open the locked gate to enter the property.  When Plaintiff

encountered them as they were walking around the property, Plaintiff asked them to

produce a warrant.  In response to Plaintiff's request, DeLisle produced the search

warrant issued on July 3, 2017.  This was the first time any warrant was produced or

displayed to Plaintiff since July 4, 2017.  Neither Perez nor DeLisle responded to

Plaintiff's requests that they tell her what they wanted to look at or allow her to show

them what they wanted to see.  Perez, DeLisle and the New York State trooper walked

through the barns and paddocks again, then left the property by pushing through the gate.

59.    These repeated and unannounced visits by DeLisle and Perez caused

Plaintiff great fear and anxiety.  Plaintiff did not know when they would come, whether

they would be accompanied by New York State troopers, whether she would be arrested

again as Perez had threatened on July 7th, whether they would interrupt her or her

employees' work, or whether they would interfere with animals belonging to her or her

clients.  Perez's and DeLisle's manner during these visits was hostile, aggressive,

threatening and bullying.

60.    The repeated and unannounced visits by DeLisle and Perez also interfered

with Plaintiff's ability to conduct her business.  Each time one or both of them appeared,

whether with or without New York State troopers, Plaintiff was forced to stop what she

was doing, including providing care to the animals on the farm and dealing with other

persons who were providing services to her or to whom she was providing services.

Plaintiff was compelled to accompany DeLisle and Perez, providing them with access to

the animals they insisted on viewing, as well as to Plaintiff's barns and paddocks.  This

constant and stressful interruption disrupted Plaintiff and her employees, resulting in

Plaintiff experiencing difficulties in retaining employees.

61.     The repeated and unannounced visits also interfered with Plaintiff's

ongoing business relations with her clients.  The two clients who were boarding horses at

Plaintiff's farm became uncomfortable with the constant scrutiny by agents of law

enforcement, as well as the negative effect those visits were having on Plaintiff's ability

to attend to business, and the negative effect on their sensitive thoroughbred horses.

Ultimately, both clients removed their horses from Plaintiff's farm, not because they were

dissatisfied with her care of their horses but because of the disruptions caused by the

criminal prosecution and their effect on Plaintiff.

The Criminal Prosecution

62.     The County, through its District Attorney, issued ten accusatory

instruments against Plaintiff, each dated July 8, 2017.  These instruments charged

Plaintiff with failure to provide sustenance to animals pursuant to Section 353 of the New

York Agriculture & Markets Law, which were misdemeanor charges under New York

law.  The instruments charged that Plaintiff had (i) failed to provide water to nine horses

and a donkey in the paddock where the rescue horses were kept on July 1, 2017, (ii)

failed to provide "proper sustenance" for eight horses on July 4, 2017, and (iii) failed to

provide water for approximately seven horses and three foals in stalls in one of the barns

on July 4, 2017.

63.     The supporting materials attached to these accusatory instruments, on their

face, did not support the charges in those instruments.  They did not contain non-hearsay

evidence that supported the alleged lack of water or proper sustenance.  They did not take

into consideration Plaintiff's efforts to show DeLisle, Perez and the troopers information

concerning the rescue horses that would have substantiated that the rescue horses were in

poor physical condition when they came into Plaintiff's custody, or that the elderly pony

was not unhealthy in spite of his appearance.

64.     In light of the foregoing, the accusatory instruments failed to establish

probable cause for Plaintiff's prosecution.

65.     Plaintiff's attorney attempted to persuade the County to withdraw the

criminal proceeding against Plaintiff.  Plaintiff's attorney told the prosecutor handling the

case that he was gathering evidence that the animals identified in the accusatory

instruments as having not been provided with proper sustenance or necessary water were

not in fact malnourished or deprived of water.  Plaintiff's attorney requested that the

prosecutor meet with him to resolve the criminal prosecution in a fair manner that did not

do continuing harm to Plaintiff.

66.     The County, via the District Attorney, rebuffed all of Plaintiff's attorney's

overtures.  Upon information and belief, nobody associated with the County, including

the District Attorney and prosecutors working on the prosecution of Plaintiff, sought to

investigate the information provided to the County by Plaintiff's attorney to determine

whether the County's delegation of complete responsibility for developing the evidence

and charges against Plaintiff had resulted in the deprivation of Plaintiff's civil rights, or

whether the SPCA, DeLisle or Perez bore any hostility toward Plaintiff that affected their

recommendation of the prosecution.

67.     In light of the County's attitude, by motion dated October 19, 2017

Plaintiff moved before the Town Justice Court of the Town of Clermont to dismiss the

accusatory instruments in the interest of justice.  Plaintiff showed in detail that the
accusatory instruments were insufficient on their face to support the charges.  In addition,
Plaintiff submitted documentary evidence refuting the County's claims that Plaintiff had
failed to provide proper sustenance or necessary water to the identified animals.

68.     On October 20, 2017, rather than respond to Plaintiff's motion to dismiss,
the County's District Attorney served Plaintiff's attorney with notice that the County
intended to present the misdemeanor charges in the accusatory instruments to a grand
jury in Columbia County.  Upon information and belief, this was a very unusual course of
action for the County to take in a misdemeanor prosecution.  Upon information and
belief, the County sought presentation to a grand jury in the belief that the town justice
court was likely to grant Plaintiff's motion to dismiss the accusatory instruments,
whereas a grand jury was more likely to indict Plaintiff.

69.     On that same date, Plaintiff notified the County that she would exercise
her right to testify before the grand jury, and to present witnesses and evidence in support
of her testimony.

70.     Upon information and belief, DeLisle and Perez testified before the grand
jury in support of the County's presentation against Plaintiff.  The presentation took place
on December 12, 2017.

71.     Following the conclusion of the County's presentation, Plaintiff testified
before the grand jury.  Plaintiff denied that she had failed to provide proper sustenance
and water to the animals identified in the accusatory instruments.  Plaintiff also proffered
other witnesses, including vendors and clients, to testify that she had provided adequate
food and water to the animals at the farm.  In addition, Plaintiff proffered the testimony

of an equine veterinarian that the animals that had been identified as thin, very thin or emaciated in several of the accusatory instruments were not in fact unhealthy as described by the County's veterinarian.

72.     At the conclusion of the grand jury presentation, the grand jury refused to vote a true bill against Plaintiff on the charges offered by the County.  Plaintiff was discharged on December 19, 2017.

Perez Enters Plaintiff's Farm Subsequent to Dismissal of the Prosecution

73.     On March 19, 2018, Plaintiff caused to be served on Defendants a notice of claim, alleging in substance the course of conduct set forth above.  Subsequently, on July 26, 2018, Plaintiff was examined under oath by an attorney representing the County pursuant to N.Y. General Municipal Law § 50-h.

74.     Subsequent to this examination, on or about December 27, 2018, Perez entered Plaintiff's farm accompanied by a New York State trooper.  Although the gate to Plaintiff's property was shut and locked, Perez and the trooper climbed over the fence and entered the property without Plaintiff's knowledge or permission.  Plaintiff became aware of their presence when she encountered them walking around the property. Plaintiff demanded that they produce a warrant to enter her property, whereupon Perez admitted that he did not have a warrant.  Plaintiff, who was upset and frightened by the unannounced appearance of Perez and the New York State trooper without a warrant, demanded that they leave the property.  Perez attempted to engage Plaintiff in conversation despite her demands that they leave.  Ultimately, in Plaintiff's presence, Perez and the New York State trooper climbed back over Plaintiff's fence to exit the property.

75.     Plaintiff was deeply frightened by this intrusion onto her property by
Perez and the New York State trooper, a year after the prosecution terminated.  Although
Plaintiff had prevailed in the prosecution, the fact that Perez and a New York State
trooper had subsequently trespassed on her property caused her great anxiety about the
potential resumption of efforts by Defendants to seek to use the legal system to persecute
her.

Harm Suffered by Plaintiff

76.     As a direct result of the foregoing course of conduct by the County, Perez,
DeLisle and the SPCA, Plaintiff was seriously injured in several respects.

77.     Plaintiff suffered out-of-pocket losses resulting from the criminal
prosecution.  Plaintiff was compelled to retain legal counsel to defend her in the criminal
proceeding.  She also had to retain the services of experts in equine veterinary medicine
to assist in the preparation of Plaintiff's defense and to testify before the grand jury.
Plaintiff also was forced to incur expenses and disbursements associated with her defense
that she would not have had to incur but for the criminal prosecution.  In addition,
Plaintiff had to engage additional workers to be present at the farm while she had to be
absent to prepare for and testify before the grand jury.

78.     Plaintiff suffered loss of business as a result of the publicity surrounding
her arrest and the criminal charges against her.  Several news outlets published stories
concerning her arrest and the charges.  These news stories were widely circulated,
including on television and the internet.  As a result, Plaintiff was unable to continue
business relations with existing clients, who did not wish to associate with a person who
had been charged with depriving animals under her care of proper sustenance and water.

Plaintiff also suffered loss of business because she was forced to devote significant amounts of time to her defense of the criminal charges, which affected her ability to maintain her business as it had been prior to July 1, 2017.  In addition, Plaintiff suffered loss of business because skilled and highly qualified workers who would otherwise have been willing to come to work for her, or continue to work for her, would not do so because of the stigma of working for someone who had been charged with mistreatment of animals in her care.

79.     Plaintiff suffered loss of future income and business opportunities as a result of the criminal charges.  Before the arrest and the criminal proceeding, Plaintiff had been developing a thriving business in breeding thoroughbred horses.  After the criminal proceeding was brought, Plaintiff found herself excluded from opportunities to attract further such business.  Clients who boarded their horses with her removed their horses due to the stigma attaching to Plaintiff because of the criminal prosecution.  Plaintiff also was unable to continue to attract business as an equine appraiser because people who heard or read about the prosecution shunned her.  And Plaintiff was forced to forfeit the purchase of a promising thoroughbred horse, which Plaintiff had purchased at the end of June 2017, due to the prosecution and threats by the prosecutor to ask the judge to prevent Plaintiff from bringing more horses onto the farm, depriving Plaintiff of the purchase price she had paid as well as the proceeds of the anticipated sale of the animal.

80.     Plaintiff suffered reputational harm.  Starting on or about July 5, 2017, when the news stories about Plaintiff's arrest and the criminal charges were first published, people who read these stories circulated statements disparaging to Plaintiff based on the claims in the criminal proceeding.  These statements appeared in various

Facebook horse fancier groups, in the comments to the internet versions of the news stories, and elsewhere.  Plaintiff was accused of having harmed, neglected and starved animals in her care or deliberately deprived them of water, in reliance on the criminal claims.  Even in the aftermath of the dismissal of the criminal case, these false statements and erroneous news stories are still accessible on the internet and continue to tarnish Plaintiff's reputation.

81.     Plaintiff suffered emotional harm.  As a result of the treatment that Plaintiff received from DeLisle and Perez, the unannounced appearances on her farm of New York State troopers and others, the arrest itself, the continued criminal prosecution, and the harassment by Perez after Plaintiff made her intention to seek civil remedies known, Plaintiff has suffered severe emotional distress, which has manifested itself in anxiety, depression, suicidal ideation, insomnia, panic attacks, and inability to concentrate.

Notice of Claim

82.     Plaintiff timely served a Notice of Claim on the County and the SPCA, among others, on March 19, 2018.  More than thirty days have elapsed since the service of the Notice of Claim.  This action is being commenced within one year and ninety days following the termination of the criminal prosecution in Plaintiff's favor.

FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 Against the County

83.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 82 above as though fully set forth herein.

84.     At all times relevant hereto, the County, through its chief policy-maker the District Attorney, has had a policy and/or custom of delegating to the SPCA and its

personnel the investigation of complaints, as well as the responsibility for determining whether a criminal prosecution of persons for acts of cruelty to animals should be commenced and continued.

85.    In pursuit of this policy and/or custom, the County accepts without question the truthfulness, accuracy and completeness of representations made to its District Attorney and other prosecutors by the SPCA and its personnel that such persons had actually committed acts of cruelty to animals.

86.    In further pursuit of this policy and/or custom, the County makes no effort independently to confirm that the conduct that the SPCA and its personnel claimed violated New York State law actually took place or violates any laws.

87.    In further pursuit of this policy and/or custom, the County permits the SPCA and its personnel to submit affidavits in support of search warrant applications that are materially misleading.

88.    When confronted with information that criminal charges arising from the operation of the County's foregoing policy and/or custom has resulted in violations of the civil rights of persons prosecuted for animal cruelty, the County's policy and/or custom is to reject such information and make no effort independently to examine whether the prosecution should be dismissed.

89.    The County, through its District Attorney, adopted and continued the foregoing policy and/or custom with deliberate indifference to the plainly obvious consequences thereof, namely that it would cause the arrest and prosecution of persons, including Plaintiff, as to whom there was no probable cause to arrest or prosecute.

90.     The County commenced and continued the prosecution of Plaintiff in conformity with the foregoing policy and/or custom, notwithstanding that the County received information sufficient to provide it with notice that the prosecution of Plaintiff violated her due process rights under the Fourth and Fourteenth Amendments to the Constitution.

91.     The County lacked probable cause to commence and continue the criminal prosecution of Plaintiff.

92.     The prosecution was terminated in Plaintiff's favor by the dismissal of the charges against Plaintiff when the grand jury refused to vote a true bill.

93.     The prosecution was instituted and continued against Plaintiff by the County with actual malice.

94.     Because of the County's exercise of the foregoing policy and/or custom against Plaintiff, which constituted malicious prosecution of Plaintiff, Plaintiff was deprived of her due process liberty rights to be free of unlawful searches and seizures without due process of law, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

95.     As a result of the foregoing conduct, Plaintiff was injured as set forth above.

96.     Plaintiff is entitled to judgment as a result of the County's violation of her civil rights in an amount to be determined at trial, but believed to be not less than $1,000,000.00.

## SECOND CLAIM FOR RELIEF
Common-Law Malicious Prosecution Against the County

97.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 96 above as though fully set forth herein.

98.    The County, through its District Attorney, commenced and continued the criminal proceeding against Plaintiff.

99.    The criminal proceeding against Plaintiff was terminated in Plaintiff's favor on December 19, 2017.

100.   The County lacked probable cause to commence and continue the criminal proceeding against Plaintiff.

101.   The criminal proceeding was instituted and continued against Plaintiff by the County in actual malice.

102.   In light of the foregoing, the County maliciously prosecuted Plaintiff, thus entitling Plaintiff to judgment.

103.   Plaintiff was injured as a direct result of the County's actions and the actions of its agents and employees in connection with the criminal proceeding against her, in the manner set forth above.

104.   Plaintiff is entitled to judgment as a result of the County's malicious prosecution of her, in an amount to be determined at trial but believed to be not less than $1,000,000.00.

## THIRD CLAIM FOR RELIEF
42 U.S.C. § 1983 Against DeLisle, Perez and the SPCA

105.   Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 104 above as though fully set forth herein.

106.    Pursuant to N.Y. Agriculture & Markets Law § 371, New York State Peace Officers, including "any agent or officer of any duly incorporated society for the prevention of cruelty to animals", are empowered, among other things, to arrest and bring before a court persons offending against the provisions of Article 26 of the New York Agriculture & Markets Law.

107.    The SPCA is and at all relevant times was a duly incorporated society for the prevention of cruelty to animals.

108.    DeLisle and Perez are and at all relevant times were agents and/or officers of the SPCA.

109.    DeLisle and Perez are and at all relevant times were New York State Peace Officers within the meaning of Section 371 of the New York Agriculture & Markets Law.

110.    As New York State Peace Officers, DeLisle and Perez were acting under color of state law in connection with the conduct alleged above.

111.    As New York State Peace Officers, DeLisle and Perez were state actors within the meaning of 42 U.S.C. § 1983 in connection with the conduct alleged above.

112.    As a result of the foregoing conduct, Plaintiff's rights, pursuant to the Fourth Amendment to the United States Constitution, to be free of unreasonable searches and seizures, were violated by DeLisle, Perez and the SPCA.

113.    As a result of the foregoing, Plaintiff's due process liberty rights pursuant to the Fourteenth Amendment to the United States Constitution were violated by DeLisle and the SPCA.

114.    As a result of the foregoing conduct by DeLisle, Perez and the SPCA, Plaintiff was injured as set forth above.

115.    Plaintiff is entitled to judgment as a result of the deprivation of her Constitutional rights, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial but believed to be not less than $1,000,000.00.

FOURTH CLAIM FOR RELIEF<br>42 U.S.C. § 1983 Against DeLisle

116.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 115 above as though fully set forth herein.

117.    For the reasons set forth in Paragraphs 106 through 111, DeLisle was a state actor within the meaning of 42 U.S.C. § 1983 in connection with the conduct alleged above.

118.    On July 1, 2017, prior to the time that he made his sworn statement, DeLisle knew that Plaintiff had provided adequate sustenance and water to the horses and other animals in her care that he had seen on her farm earlier that day.

119.    In making his sworn statement, DeLisle knowingly and intentionally omitted the following material and relevant information:

a.      DeLisle did not reveal that he had procured Plaintiff's signature on the consent to search form by threatening to immediately arrest her if she did not comply with his shouted demands that she sign;

b.      DeLisle did not disclose that Plaintiff had explained to him and the New York State trooper that the rescue horses he identified in his statement had come into Plaintiff's possession in poor physical condition;

c.      DeLisle did not disclose that Plaintiff had offered several times on July 1, 2017 to show him and the New York State trooper who had accompanied him the documents substantiating her claims regarding the rescue horses, but DeLisle had refused to allow her to do so; and

> d.  DeLisle did not reveal that Plaintiff had explained to him that the pony referenced in his statement as having been extremely emaciated was very old and that, notwithstanding his appearance, he was being given adequate food, water and shelter.

120.   DeLisle, as the Chief Investigator for the SPCA, knew that his statement would be used as a basis for the issuance of a search warrant of Plaintiff's property and the seizure of animals under the authority of such a warrant.  DeLisle also knew that his statement must not be materially misleading.

121.   Notwithstanding the foregoing, DeLisle prepared and executed a statement, to be used as a basis for an application for a search warrant, which was materially misleading.

122.   During one of his subsequent visits Plaintiff's farm after July 4, 2017, DeLisle explicitly referenced a person known to him and to Plaintiff, who had been involved in a false complaint against Plaintiff by her former tenant, stating that this person had "a big smile" when he told her that Plaintiff had been arrested.  DeLisle intended Plaintiff to understand from this statement that he had acted in concert with this person in causing the prosecution of Plaintiff to be commenced and continued.  Plaintiff did understand DeLisle's statement in this manner.

123.   Upon information and belief, DeLisle testified before the grand jury in a manner consistent with his sworn statement, without supplying the material and relevant information referenced above and without informing the grand jury of his connection with the person to whom he made reference during his visit to Plaintiff reference above.

124.   As a result of the foregoing, DeLisle prosecuted Plaintiff with actual malice.

125.     As a result of the foregoing, DeLisle deprived Plaintiff of her due process rights under the Fourth and Fourteenth Amendments to the United States Constitution.

126.     As a result of the foregoing conduct by DeLisle, Plaintiff was injured as set forth above.

127.     Plaintiff is entitled to judgment against DeLisle as a result of the deprivation of her Constitutional rights, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial but believed to be not less than $1,000,000.00.

## FIFTH CLAIM FOR RELIEF
Negligent Infliction of Emotional Harm Against DeLisle and Perez

128.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 127 above as though fully set forth herein.

129.     As a direct result of the foregoing conduct by DeLisle and Perez, Plaintiff suffered severe emotional distress.

130.     DeLisle and Perez knew or should have known that their conduct was likely to and actually did cause Plaintiff severe emotional distress.

131.     As New York State Peace Officers engaged in the investigation and prosecution of alleged violations of law by Plaintiff, DeLisle and Perez had a duty to Plaintiff not to act in a manner that was likely to cause her to suffer severe emotional distress.

132.     The foregoing conduct of DeLisle and Perez was extreme and outrageous.

133.     In light of the foregoing, DeLisle and Perez are liable for the negligent infliction of emotional harm upon Plaintiff.

134. Plaintiff is entitled to judgment against DeLisle and Perez for their negligent infliction of emotional harm upon her, in an amount to be determined at trial but believed to be not less than $1,000,000.00.

SIXTH CLAIM FOR RELIEF
*Respondeat Superior* Against the SPCA

135. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 134 above as though fully set forth herein.

136. At all times relevant to the allegations in this complaint, the SPCA was the employer of DeLisle and Perez.

137. As the employer of DeLisle and Perez, the SPCA is and at all relevant times was responsible for their actions taken in the course of their regular duties.

138. As the Chief Investigator of and a "cruelty investigator" for the SPCA, DeLisle's regular duties include the investigation of potential violations of Section 353 of the New York Agriculture & Markets Law.

139. As a "cruelty investigator" for the SPCA, Perez's regular duties include the investigation of potential violations of Section 353 of the New York Agriculture & Markets Law.

140. DeLisle and Perez engaged in the conduct set forth above with respect to Plaintiff in the course of their regular duties.

141. As the employer of DeLisle and Perez, the SPCA is liable for the harm to Plaintiff caused by the conduct of DeLisle and Perez in the course of their regular duties.

142. As a result of the foregoing, Plaintiff was injured as set forth above.

143. Plaintiff is entitled to judgment against the SPCA in an amount to be determined at trial but believed to be not less than $1,000,000.00.

SEVENTH CLAIM FOR RELIEF
Punitive Damages Against Perez, DeLisle and the SPCA

144.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 143 above as though fully set forth herein.

145.     Perez and DeLisle acted in their individual capacities in violating Plaintiff's Constitutional rights, as set forth above.

146.     The foregoing actions of Perez and DeLisle were engaged in with callous disregard for the rights of Plaintiff.

147.     Perez and DeLisle engaged in the above-described conduct intentionally and maliciously, and with a desire to cause harm to Plaintiff.

148.     The conduct of Perez and DeLisle was outrageous.

149.     The SPCA, as the employer of Perez and DeLisle, knew and approved of their conduct with respect to Plaintiff.

150.     As a result of the foregoing, Perez, DeLisle and the SPCA should be held jointly and severally liable to Plaintiff for punitive damages in an amount to be determined at trial but believed to be not less than $10,000,000.00.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     On the First, Second, Third, Fourth, Fifth and Sixth Claims for Relief, granting Plaintiff damages jointly and severally, in an amount to be determined at trial but not less than $1,000,000.00;

B.     On the Seventh Claim for Relief, granting Plaintiff punitive damages jointly and severally, in an amount to be determined at trial but, in any event, not less than $10,000,000.00;

37

      C.      On all Claims for Relief, granting Plaintiff judgment for her costs and disbursements of this action, including reasonable attorney's fees; and

      D.      Granting Plaintiff such other relief as the Court may deem just and equitable.

Plaintiff demands trial by jury.

Dated:      Red Hook, New York
             March 15, 2018

**s/ Lisa Rosenthal**
Lisa Rosenthal, Bar Number: 700844
*Attorneys for Plaintiff*
MANSFIELD, GAUTIER & ROSENTHAL LLP
P.O. Box 3 (US Postal Service)
55 Old Post Road North (deliveries)
Red Hook, New York 12571
Telephone and Fax:  (845) 876-1086
Email:  rosenthal@mgrlawyer.com
